## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

**AUGUST SESSION, 1999**

**FILED**

September 22, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

STATE OF TENNESSEE,          *
                             *          **No. 01C01-9811-CR-00451**
      Appellee,           *
                             *          **DAVIDSON COUNTY**
vs.                          *
                             *          **Hon. Cheryl Blackburn, Judge**
CLARENCE DAVIS,        *
                             *          **(Premeditated First Degree Murder)**
      Appellant.          *

For the Appellant:

**Jeffrey A. DeVasher**
Assistant Public Defender
1202 Stahlman Building
Nashville, TN  37201

(ON APPEAL)


**Ralph Newman**
Assistant Public Defender
1202 Stahlman Building
Nashville, TN  37201

(AT TRIAL)


**Karl Dean**
District Public Defender

For the Appellee:

**Paul G. Summers**
Attorney General and Reporter

**Georgia Blythe Felner**
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493


**Victor S. Johnson III**
District Attorney General

**Dan Hamm**
Asst. District Attomey General
Washington Sq., Suite 500
222-2nd Avenue, N.
Nashville, TN  37201

OPINION FILED: _____

REVERSED; CONVICTION MODIFIED TO SECOND DEGREE MURDER;
REMANDED FOR SENTENCING


**David G. Hayes,** Judge

**OPINION**

The appellant, Clarence Davis, was convicted of the premeditated first degree murder of Benjamin Kirk in the Davidson County Criminal Court and was sentenced to life imprisonment. In this appeal, the appellant challenges the sufficiency of the evidence supporting his first degree murder conviction, specifically he argues that the proof failed to establish beyond a reasonable doubt the requisite element of premeditation.

After a review of the evidence presented at trial, we conclude that the proof is insufficient to support a conviction for premeditated first degree murder. Accordingly, we vacate the judgment of conviction and sentence entered by the trial court. However, we find evidence sufficient to support a conviction of second degree murder. This case is remanded to the trial court for resentencing.

**BACKGROUND**

In May of 1997, the appellant and his wife lived with the appellant's mother-in-law, Corrine Bell, in Nashville. The backyard of the Bell residence joined the backyard of Benjamin Kirk. No fences or other barriers separated the yards. On Memorial Day afternoon, May 26, the appellant and Ben Kirk visited with one another while relaxing in their backyards. During a portion of the afternoon, the appellant was preparing to grill for members of his wife's family that were arriving at the Bell residence. After 5 p.m., the appellant and Kirk were joined by Kirk's friend James Bass. Both Bass and Kirk were professors at Tennessee State University.

Over the next "two and a half to three hour period of time" the appellant traveled "back and forth" between his yard and Kirk's yard. During this period, Kirk, Bass, and the appellant routinely engaged in conversation and the drinking of Kirk's

Crown Royal whiskey. The appellant's nieces who had arrived earlier for the barbeque ventured into Kirk's backyard to play with the appellant's Rottweiler dog that was running loose in Kirk's yard. One of the nieces, approximately four years old, approached the three men at the table. Kirk placed the child on his knee while preparing her a hotdog. Bass observed nothing inappropriate about Kirk's behavior with the child.

Thereafter, Kirk invited his wife to join the men outside. Kirk and the appellant continued to drink Crown Royal. Abruptly, the appellant stood and began dancing to the music with a gun in his hand "swinging it from side to side." After a few minutes, the appellant stopped dancing and placed the gun inside the waistband of his pants. Bass testified that he witnessed no argument or hostility between Kirk and the appellant. Feeling uncomfortable, however, in his present surroundings, Bass left the Kirk's residence around 8:40 p.m.

Brenda Kirk, the wife of the victim, testified that she remained inside for the majority of the time the three men were outside. However, that evening, Mrs. Kirk observed the appellant dancing in front of Mr. Bass but she did not notice a gun in the appellant's hand. Finding his behavior odd, she returned indoors and went to bed around 9 p.m. Sometime after 11 p.m., her neighbor, Ms. Bell, telephoned to inform her that something had happened to her husband. Mrs. Kirk, having awakened her daughter, ran downstairs and found her husband lying on the patio. Soon thereafter, the paramedics and the police arrived to find the victim deceased.

Detective Clifford Mann with Metro Police arrived at the crime scene between 11:30 p.m. and midnight. He assisted with the interviews of Ms. Bell and Mrs. Kirk. The crime scene revealed three spent .380 shell casings. No one witnessed the shooting, nor was any weapon ever discovered. After the shooting, the appellant unchained his dog, told his wife and mother-in-law what he had done, and walked

3

six miles into downtown Nashville. Several days later, on June 3, 1997, the appellant was taken into custody. Following the appellant's waiver of his constitutional rights, he provided the police with a detailed statement admitting his shooting of the victim. The appellant's recorded statement, which was a crucial part of the State's proof, was introduced into evidence at trial. Excerpts of the statement relevant to the issue of premeditation are as follows:

> [Kirk] had been knowing me for eight years and it ain't like I'm no perfect stranger to him. . . [W]e were best buddies.
> . . .
> So we was over there. . . and then he grabbed my little nieces, you know, he was cuddling them, you know, and I was sitting there watching him and then Coach Bass was just smiling at him as he was fondling them. . . And then I told them to go on back over there on their side of the yard and do what they gonna do, you know, play on over there . . . Kirk persuaded me and the Coach and kids to come on back over there again. . . . And he sat (name inaudible) on his knee first and then he started fondling her . . . I sent them on back over there and we just kept on listening to music and drinking and things. Then . . . everybody left. . . and me and him [Kirk] and Coach Bass was just sitting there and I got to talking to Kirk about, you know, what he had been doing. . . . Coach Bass. . .[left] at that particular time.
> . . .
> I figured I was there you know and it was my responsibility . . . to do something about it. . . . I didn't have no intention of doing nothing physically to him, I just wanted . . . [to] communicate with him. Let him know how I feel so he can correct himself.
> . . .
> He got up - he stand up and I stand up - you know. . . we got in an heated argument. He told me, what you talking about nigger. So he stood up and I stood up you know and then that's when Bass walked toward the door talking to his [Kirk's] wife. . . . He pushed me cause I'm trying to relate to him you know and he get hostile with me you know. . . I was trying to communicate with him. You know - I was trying to tell him what he was doing - trying to make him see what he was doing.
> . . .
> I keep my weapon on me. . . .
> Q: (Detective) And you had it on your side- while you was barbequing - when he asked you to come over there?
> A: (Defendant) Yes,. . . I had come from the other side of town - on fortieth - and I just you know had it and hadn't put it away.
> . . .
> Q: (Detective) Now Clarence, why didn't you, when you saw it was getting out of hand, and he had done something to offend you, why didn't you leave and go to your house and call the police and report him?
> A: (Defendant) I don't know. I just wasn't thinking.

Dr. Bruce Levy, the medical examiner for Davidson County, testified that the victim exhibited two gunshot wounds, one to the right side of his face fracturing the

4

bones of the skull and the other to his abdomen piercing his aorta, intestines, and backbone. The doctor testified that both wounds were potentially fatal. He stated that the gunshot wound to the abdomen was fired in contact range, i.e., where the gun is in actual contact with the body when fired. The doctor determined the cause of death to be hemorrhaging from the gunshot wound to the abdomen. The toxicology report revealed that the victim's blood/alcohol content was .13 grams. From this report, the doctor opined that the victim had consumed about a dozen "one-and-a-half ounce" shots of whiskey.

Following this testimony, the State rested their case and the defense presented no proof. The jury returned a verdict of first degree premeditated murder.

**Sufficiency of the Evidence**

The appellant contends the proof is insufficient to support a verdict of first degree murder. Specifically, he asserts that there is no evidence of premeditation. He argues that, at best, the evidence supports second degree murder.

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). It is the appellate court's duty to affirm the conviction if the evidence viewed under these standards was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 743 (1995); Tenn. R. App. P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn therefrom. State v. Harris, 839

5

S.W.2d 54, 75 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368 (1993).

Once a homicide is established it is presumed to be second degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). The State, then, has the burden of proving the element of premeditation to elevate the offense to first degree murder. Id. Premeditation necessitates "the exercise of reflection and judgment," requiring a "previously formed design or intent to kill."[1] State v. West, 844 S.W.2d 144, 147 (Tenn. 1992).

The element of premeditation is a question for the jury and may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993), perm. to appeal denied, (Tenn. 1994). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the appellant's conduct in light of the surrounding circumstances. State v. Johnny Wright, No. 01C01-9503-CC-00093 (Tenn. Crim. App. at Nashville, Jan. 5, 1996). Although there is no strict standard governing what constitutes proof of premeditation, several relevant circumstances are helpful, including: the use of a deadly weapon upon an unarmed victim; the fact that the killing was particularly cruel; declaration by the defendant of his intent to kill; and the making of preparations before the killing for the purpose of concealing the crime. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997), cert. denied, -- U.S. --, 118 S.Ct. 1536 (1998) (citing Brown, 836 S.W.2d at 541-42). Additional factors from which a jury may infer premeditation include planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing. Gentry, 881 S.W.2d at 4-5 (citation omitted).

Taken in the light most favorable to the State, the proof established that the

---

[1]"'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the person to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." Tenn. Code Ann. § 39-13-202(d) (1997).

6

appellant and the victim were friends for nearly eight years and had been neighbors for a month. On the day of the homicide, at the victim's invitation, the appellant joined him and Bass for drinks and continued visiting with them throughout the evening. Bass confirmed that both the victim and the appellant were drinking whiskey throughout the evening as confirmed by the victim's toxicology report. Their relationship was amicable without any previous history of animosity. Moreover, all conversations that evening, as testified to by Bass, were amicable as well. Indeed, the proof shows that, on this evening, the appellant and the victim's relationship remained harmonious. There existed no indication of any hostility until the accusation by the appellant toward the victim erupted into an argument between the two. After confronting the victim with the accusation, the victim became hostile and shoved the appellant. Then, the appellant pulled the gun on the victim and admittedly shot the victim twice at close range. The proof does not support the proposition that the appellant obtained the weapon to use against the victim. Rather, the only proof as to this issue indicates that the appellant always carried a weapon.

After careful consideration of all the facts and circumstances surrounding this homicide, we are unable to conclude that the element of premeditation was established. Indeed, the appellant's confrontation with the victim regarding the alleged sexual abuse and the subsequent altercation which resulted in the shooting is not indicative of the "exercise of reflection and judgment." Moreover, although the appellant admitted that it was his "responsibility . . . to do something about [the fondling]" of his nieces, the record does not support proof beyond a reasonable doubt of homicidal intent at this point. Indeed, the appellant's statement at this stage manifested the opposite, i.e., "I didn't have no intention of doing nothing physical to him." As evidence of premeditation, the State contends that the evidence is sufficient based upon the use of the deadly weapon upon an unarmed victim and the two shots that hit the victim. Although we agree that this homicide

7

was committed with a deadly weapon against an unarmed victim, that alone will not support premeditation. Otherwise, all homicides involving a deadly weapon would constitute first degree murder. See State v. Tune, 872 S.W.2d 922, 925 (Tenn. Crim. App. 1993). Moreover, we cannot conclude that the two shots constitute evidence of premeditation because "[r]epeated blows can be delivered in the heat of passion, with no design or reflection." Brown, 836 S.W.2d at 542.

Next, the State contends that the victim had sufficient time to contemplate his actions in order to remove the gun from his waist area and aim it at the victim. The State argues that because the appellant fired one shot at contact range into the abdomen and then another at the victim's head, that firing at different parts of the victim's body suggests time to reflect upon his actions constituting premeditation.

Again, repeated blows do not constitute evidence of premeditation regardless of the different parts of the body where the shots were fired. See e.g., Brown, 836 S.W.2d at 542. While we acknowledge that only a moment of time is required to formulate premeditation, Tenn. Code Ann. § 39-13-202(d) requires that the time must be "free from excitement and passion." The evidence shows that following the accusation and argument, the victim shoved the appellant evincing passion which resulted in the victim's shooting and death. In sum, the absence of planning activity, the absence of hostility between the two, and the circumstances surrounding the manner of the killing, all militate against proof of premeditation or that the appellant killed according to a preconceived design. Absent the element of premeditation, the appellant's conviction for first degree murder cannot stand.

Notwithstanding this conclusion, again, a homicide is presumed to be second degree murder. Brown, 836 S.W.2d at 543. Second degree murder is a knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1) (1997). Under the facts of this case, we find that the proof establishes that the appellant acted "knowingly" with

an awareness that the discharge of a gun at close range to the victim's head and at contact range to the abdomen was reasonably certain to cause death. <u>See</u> Tenn. Code Ann. § 39-11-106 (20) (1997). We conclude that there is evidence to support "knowing" conduct, and, therefore, a conviction for second degree murder.

For the reasons set forth above, we reverse the appellant's conviction for premeditated murder and vacate the accompanying sentence. This cause is remanded to the trial court for entry of judgment of conviction in accordance with this opinion and for re-sentencing consistent with the principles of sentencing.

_____
DAVID G. HAYES, Judge

CONCUR:

_____
JOE G. RILEY, Judge

_____
L. T. LAFFERTY, Senior Judge